# CHARLESTON.

JOHNSON *et als.* v. JOHNSON *et als.*

Submitted April 24, 1917.    Decided May 15, 1917.

1. SALES—*"Bailment"*—*"Sale and Contract for Resale"*—*Construction of Contract.*

   If one person receives from another a certain number of cattle and signs a written receipt therefor, reciting their combined weight to be a certain number of pounds, valued at 7c per pound, and therein ,agrees to "turn them back" the latter part of the next summer, "at 7.60 per pound," and at the same time executes his negotiable note, corresponding in amount exactly with the value of the cattle ascertained by their weight and price per pound recited in the receipt, payable unconditionally twelve months after date, with interest, to the person from whom he received the cattle, the transaction is a sale and contract to resell in the future at an advance in price, and not a mere bailment. (p. 499).

2. SAME—*Specific Performance—Personal Property—Breach of Contract—Damages.*

   Such contract of resale, involving as it does only personal property, can not be specifically enforced, but its breach by either party entitles the other to damages which are measured by the difference between the value of the cattle at 7.60c per pound and their market value, at the time they were to be redelivered. (p. 501).

   (LYNCH and RITZ, JUDGES, dissenting.)

Appeal from Circuit Court, Greenbrier County.

Suit in equity by C. H. Johnson and others, executors of the estate of A. E. Johnson, deceased, against E. S. Johnson and C. E. Skaggs and L. C. Lemons, partners, etc., and others. Decree for plaintiffs, and Skaggs and Lemons, partners, etc., appeal.

   *Reversed in part.    Affirmed in part.    Remanded.*

*Thos. N. Read,* for appellants.
*Henry Gilmer,* for appellees.

WILLIAMS, JUDGE:

A. E. Johnson died, testate, in December 1915, and his executors brought this suit in equity against his heirs and creditors for the purpose of obtaining the direction of the court

in the matter of settling up his estate, and for the sale of sufficient property, both real and personal, to pay testator's debts, specifically setting forth in the bill numerous controverted matters arising between the creditors, and between certain other creditors named and the executors, growing out of the business transactions of testator in his lifetime.

Only one question is presented by this appeal, taken by C. E. Skaggs and L. C. Lemons, partners trading as Skaggs & Lemons, from a decree pronounced in favor of the executors against them on the 21st of December, 1916, holding that a certain transaction between appellants and the testator was a sale, by the former to the latter, of certain cattle, with the option to repurchase them at a stipulated price the following autumn, instead of a contract of bailment as appellants contended.

Appellants delivered to testator thirty-two head of cattle, and took from him the following receipt therefor:

"Fort Spring, W. Va., Oct. 14th, 1915.

"Received of Skaggs and Lemons (32) Thirty-two cattle weighing 27,020 pounds, at 7 cts. per pound, to be turned back during (during) latter part of summer and fall of 1916, at 7.60 per pound.          (Signed)    A. E. Johnson."

At the same time he executed to them the following note:
"$1891.40                    Alderson, W. Va., Oct. 14, 1915.

"Twelve months after date I promise to pay to the order of Skaggs & Lemons, without offset, Eighty Hundred Ninety-one and 40/100 Dollars, negotiable and payable at The First National Bank of Alderson, of Alderson, W. Va., value received.          (Signed)    A. E. Johnson."

Appellants indorsed the note to the First National Bank of Alderson, and took it up after this suit was brought. The case was referred to a commissioner to take and state an account of certain matters and report to court, among them the matter here in controversy, respecting which the commissioner filed a special report in which he held the contract to be a sale and option to repurchase, and not a bailment, and appellants excepted. The court overruled the exception and de-

creed the cattle to be the property of testator's estate. The depositions of appellants and one other witness, taken on their behalf before the commissioner, were returned with his report, and they are a part of the record now before us. The testimony of appellants, so far as it relates to the personal transaction had with the testator can not be considered. As to that matter they are clearly incompetent to testify. But even if their testimony could be considered, it does not prove their contention. It does not aid the court in the interpretation of the written evidence, contained in Johnson's receipt and note. The testimony of the other witness, Mr. Pence, Johnson's tenant on the farm where the cattle were delivered, to the effect that Mr. Johnson told him to keep the thirty-two cattle on a certain boundary, separate from other cattle, is consistent with either theory of the case, and sheds no light upon the transaction. Nor does the certificate of the clerk of the county court, showing that thirty-two head of cattle were listed for taxation in the name of Skaggs & Lemons, for the year 1916, in the district in which the cattle were turned over to Johnson, or the sheriff's receipt to them for the taxes paid thereon for that year, affect the character of the original transaction. The cattle were listed and the taxes levied on them paid after Johnson's death. Appellants could not alter their situation respecting the property, or affect the interest of Johnson's estate therein by their conduct subsequent to his death.

The intention of the parties governs in determining the true nature of the contract, and their intention can be ascertained only from the language of the contract. The circumstances surrounding the parties at the time it was made are altogether consistent with the theory of a sale. Numerous authorities are cited by counsel for appellants to support their contention that it was a bailment for the purpose of pasturage. But none of them go any further than to affirm the general rule that the intention of the parties determines the character of the contract, and none of them present a state of facts similar to those presented here. It is often a perplexing question to determine whether a certain transaction is a sale or a bailment, the true intention of the parties

being obscured by the wording of the contract and there being no contemporaneous circumstances indicating their purpose. 'In the present case, however, we are fully convinced the parties meant the contract as a sale by weight, with the right reserved to the sellers to repurchase at an increased price per pound. Otherwise, why did appellants take Johnson's note on the day of the transaction, corresponding exactly with the value of the thirty-two cattle, at 7c per pound? If it was a bailment the note was without consideration. It was unconditional and was actually negotiated and the money paid for it. Counsel insist that it was taken as collateral security. Security for what; for the return of their own property? Such precaution would indeed be quite unnecessary, and certainly a very unusual thing in a contract of bailment. The bailor's title is all the security he needs to insure the return of his property, and in this instance Johnson's compensation for the bailment, if such it was, being dependable on and measured by, not only the advance in price per pound, but also by the additional weight he might put upon the cattle, was certainly a matter of sufficient personal interest to him to secure the faithful performance of his contract. If it was a bailment, the note was a pure gratuity, yet it recites that it was for a valuable consideration, and its execution is consistent only with the theory of a sale, for its only consideration was the property in the cattle. The receipt for the cattle, weighing 27,060 pounds, at 7c a pound, and the agreement, expressed in the same instrument, that they should "be turned back" at 7.60 cents per pounds, is perfectly consistent with the theory of a sale. The words quoted do not any more import a mere redelivery of the possession than they mean a transfer of both possession and title. The transaction has the same effect as if Johnson had paid the cash, instead of executing his note. The fact that appellants repurchased the note, after they had negotiated it, and after this suit was brought, can not change the nature of the transaction.

As throwing additional light upon the nature of the transaction, let us suppose some of the cattle had died while they were in Johnson's possession, on whom would the loss have

.fallen? Unquestionably upon Johnson. Because, in no event, was he to receive more for keeping them than they would come to, at 7.60c per pound, to be ascertained at the time they were returned, less $1,891.40, their ascertained value, at 7c per pound, at the time he received them. And in the event all of them had died, although without fault on his part, he would have received nothing for their keep, and would have been obliged to pay his note. Such possible consequences, so disastrous to Johnson, are inconsistent with the theory of a bailment, unless it can be said the purpose was to make Johnson an insurer of the cattle, and it is not contended that such was the intention of the parties.

The court below treated the agreement to return the cattle as optional, and revoked by Johnson's death. It is not a mere option, but an express and binding agreement to resell the same cattle at a fixed price per pound, to be executed at a reasonably certain time in the future. It is not specifically enforceable, involving as it does only the sale of personal property easily duplicated in the market, but renders the party who breaches it liable to the other in damages. If the executors are in fact refusing to carry it out, the damages to which Skaggs & Lemons are entitled can be ascertained and allowed in the present case, which is the difference between the market value of the cattle and their value at 7.60c per pound, at the time they were to be redelivered. Skaggs & Lemons are entitled to this difference, if there is any. But we understand the executors are willing to execute the contract, as they interpret it. We construe the averment in plaintiffs' bill respecting this contract and another one, apparently similar in character, between said Johnson and E. W. Sydenstricker, relating to certain other cattle, as implying plaintiffs' willingness to resell the cattle to Skaggs & Lemons at the stipulated price, 7.60c per pound. Referring to these two contracts the bill says, "under the contracts the cattle were to be kept and fattened by the said A. E. Johnson in the year 1916, until ready for the market. This, the plaintiffs say, is the proper thing to do, but when the title passes, and what the respective rights are, will have to be determined by the court in this cause." The bill was filed in De-

cember, 1915, not long after Johnson's death, when the cattle were in the possession of the executors, and many months before the time fixed in the original agreement to execute the contract of resale. The question which plaintiffs wished the court to decide was whether the agreement was a sale to Johnson or merely a contract of bailment for pasturage; that was the matter in dispute. That question being once settled, they could determine for themselves whether they would perform the executory part of the agreement to resell the cattle to Skaggs & Lemons at the price they and Johnson had agreed on. The trouble arose because the executors were not willing to take up Johnson's note in part payment for the cattle. This is averred in an amended answer of Skaggs & Lemons, filed subsequent to the commissioner's report. They aver that they obtained the consent of the executors to ship the cattle, under an agreement that a special deposit of the purchase price should be made in the First National Bank of Alderson, to be held subject to the order of the court upon a decision of the matter in controversy; that pursuant to that agreement they shipped some of the cattle about the 24th of August, 1916, and the balance of the thirty-two head, on the 20th of October, 1916; that the purchase price of the first shipment was $1,789.80 and of the second, $1,127.08, and deposited both sums pursuant to that understanding. These sums aggregate $2,916.88. But the weight of the cattle is not made to appear nor the price per pound by which the gross sum above named was ascertained. The record does not disclose whether that represents the price of the cattle at 7.60c per pound, according to their weight at the time they were delivered for shipment, or the price Skaggs & Lemons received for them in market at a different price per pound. We take it, however, to mean the former, in which case there is an error in the amount decreed to be turned over by the bank to the executors. The amount in the decree is stated only in figures and is $3,916.88. This is one thousand dollars in excess of the sum of the two amounts averred to have been deposited in bank. We are inclined to think it is only a typographical error, inasmuch as all the figures in the two amounts, except one, are identical. But there is no data in

the record by which we can determine whether the decree states correctly the value of the cattle at 7.60c per pound. That is all the executors have a right to demand from Skaggs & Lemons. Respecting Johnson's note held by Skaggs & Lemons, they are general creditors of the estate, and can not set it off against the price of the cattle, but must come in to share with other general creditors of Johnson. Being unable to determine by the record whether the error is in the amount of the decree or in the sum stated in the amended answer, we reverse the decree as to the amount decreed by it, in order that it may be corrected by the court below, if erroneous in that particular, and reverse it also in so far as the court holds the contract to resell to be an option instead of a binding contract, and affirm it in all other respects, with costs to appellants.

*Reversed in part.  Affirmed in part.*  *Remanded.*